MEMORIAL HOSPITAL–THE
WOODLANDS, Relator,

v.

The Honorable F. Scott McCOWN,
Judge, Respondent.

BROWNWOOD REGIONAL MEDICAL
CENTER, HTI Doctors Hospital, and
Medical Center Hospital, Relators,

v.

The Honorable F. Scott McCOWN,
Judge, Respondent.

Nos. 95–0316, 95–0340.

Supreme Court of Texas.

Argued Oct. 11, 1995.

Decided July 12, 1996.

Claude M. McQuarrie, III, Cyndi M. Jewell, Houston, Mary H. Greer, Austin, for Memorial Hospital–The Woodlands.

William J. Dunleavy, Frank Shor, Carrollton, for Brownwood Regional Medical Center, et al.

R. James George, Laura Lee Stapleton, Austin, Joseph G. Chumlea, David F. Bragg, Dallas, for McCown.

Justice OWEN delivered the opinion for a unanimous Court.

In these original proceedings, we must determine whether documents and files generated for and by a hospital credentialing committee in its investigation and review of a physician's initial application for staff privileges are protected from discovery. The trial court concluded that the documents at issue were discoverable, and the parties objecting to production requested mandamus relief from this Court. Because we conclude that the documents are protected from discovery under section 5.06 of Texas Revised Civil Statute article 4495b and section 161.032 of the Texas Health and Safety Code, we conditionally grant writs of mandamus.

I

In 1993, Dr. Bruce Leipzig sued CBS, Inc. and KTBC–TV, Inc. (collectively, "CBS") for libel and false light invasion of privacy after CBS aired a *48 Hours* program containing a segment entitled "Bad Medicine." In the broadcast, CBS reported that Leipzig's staff privileges had been revoked by a hospital in Arkansas, that a complaint had been filed with the Arkansas Board of Medical Examiners seeking to revoke his license for gross negligence or malpractice, and that Leipzig had then moved to Texas, where he is practicing medicine today, instead of renewing his license in Arkansas.

In the course of Leipzig's defamation action, CBS served subpoenas duces tecum on several Texas hospitals at which Leipzig had previously practiced or sought staff privileges. The hospitals include Memorial Hospital—The Woodlands, Brownwood Regional Medical Center, HIT Doctors Hospital, and Medical Center Hospital (collectively, the "Hospitals"). The subpoenas requested the Hospitals to produce all documents in their administrative and credentialing files concerning Leipzig, including "nonprivileged"

documents regarding Leipzig's application for staff privileges.

The Hospitals filed motions for protective orders, claiming that their files were privileged and exempt from discovery under sections 161.031 and 161.032 of the Texas Health and Safety Code and sections 5.06(g) and (j) of the Medical Practice Act, Texas Revised Civil Statute article 4495b. The Hospitals submitted the affidavits of their respective medical staff coordinators in support of the claimed privileges and tendered several categories of documents to the trial court for in camera inspection.

The trial court denied the Hospitals' motions for protective orders and ordered the documents produced. In a letter to the parties regarding its rulings, the trial court expressed its view that the documents at issue were privileged under section 5.06 of article 4495b, and were confidential under section 161.032 of the Health and Safety Code, but concluded that it was bound by decisions to the contrary from a court of appeals and a federal district court, citing *McAllen Methodist Hospital v. Ramirez*, 855 S.W.2d 195 (Tex.App.—Corpus Christi 1993, orig. proceeding); *Family Medical Center, U.T. v. Ramirez*, 855 S.W.2d 200 (Tex.App.—Corpus Christi 1993, orig. proceeding); and *Manthe v. Vanbolden*, 133 F.R.D. 497 (N.D.Tex.1991). The trial court stayed its rulings to allow the Hospitals an opportunity to seek mandamus relief, which was denied by the court of appeals.

In separate mandamus proceedings, the Hospitals now petition this Court. We consolidated the cases for oral argument along with two other original proceedings concerning the statutes at issue. We have issued a separate opinion today in the latter proceedings, *Irving Healthcare System v. Brooks*, 927 S.W.2d 12 (Tex.1996).

## II

■ Generally speaking, statutes such as section 5.06 of the Medical Practice Act and sections 161.031–161.033 of the Texas Health and Safety Code are based on two premises: first, that exacting critical analysis of the competence and performance of physicians and other health-care providers by their peers will result in improved standards of medical care; and second, that an atmosphere of confidentiality is required for candid, uninhibited communication of such critical analysis within the medical profession. *See* Griffith & Parker, *With Malice Toward None: The Metamorphosis of Statutory and Common Law Protections for Physicians and Hospitals in Negligent Credentialing Litigation*, 22 Tex.Tech L.Rev. 157, 158–59 (1991); Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C.L.Rev. 179, 179 (1988). Although they vary widely in scope, as of 1988, statutes to protect the work of medical review committees had been enacted in at least forty-six states. *Creech, supra,* 179–80.

■ All parties agree that the records of and communications to a medical peer review committee are generally privileged and confidential if they were generated in connection with a review of whether a physician already on staff should *retain* those privileges. The question before us is whether the exemptions from discovery and the confidentiality afforded by the Texas statutes at issue apply to the *initial* credentialing process. We conclude that they do.

■ With limited exceptions, it was the intent of the Legislature in enacting section 5.06 of article 4495b to protect from discovery in a suit for damages the reports and records received, maintained, or developed in connection with a physician's initial application for staff privileges. Tex.Rev.Civ.Stat. Ann. art. 4495b, § 5.06(g), (j), (s)(3) (Vernon Supp.1996). The express provisions of section 5.06 of article 4495b make this clear, as does the context in which the present form of section 5.06 was enacted. When section 5.06 was amended in 1987 to include the provisions at issue, Acts 1987, 70th Leg., R.S., ch. 596, § 18, 1987 Tex.Gen.Laws 2333, there was a nationwide movement to disseminate information to peer review committees and state medical boards about physicians who have had adverse actions taken against them for their lack of professional competence. A comprehensive federal act, the Health Care Quality Improvement Act, was passed by Congress in 1986. 42 U.S.C. §§ 11101–52

(1994). Among other provisions, the federal Act not only encourages hospitals considering a physician's initial application for staff privileges to consult the national databank created under the Act, but also *requires* the hospital to do so. 42 U.S.C. § 11135(a)(1).

It is apparent from the federal Act that the initial credentialing process is a critical juncture in improving the quality of medical care and that peer review should occur at that point. *See, e.g.*, 42 U.S.C. §§ 11101(1); 11151(1), (9), (10)(A). Article 4495b was enacted in this climate. Indeed, Texas chose to "opt in" to the federal Act's coverage at an early effective date. *See* article 4495b, § 5.06(a); *see also* 42 U.S.C. § 11111(c)(2)(A).

We further hold that the confidentiality provision of section 161.032 of the Texas Health and Safety Code extends to initial credentialing by medical committees.

We first consider article 4495b in greater detail.

### III

### A

■ Where a statute is unambiguous, a court must seek the intention of the Legislature as found in the plain and common meaning of the words and terms used. *Republic-Bank Dallas, N.A. v. Interkal*, 691 S.W.2d 605, 607 (Tex.1985). The express provisions of the Medical Practice Act lead us to the conclusion that initial credentialing is within the scope of section 5.06. The opening declaration of the Medical Practice Act provides:

> (1) the practice of medicine is a privilege and not a natural right of individuals and as a matter of policy it is considered necessary to protect the public interest through the specific formulation of this Act to regulate the granting of that privilege and its subsequent use and control.

Art. 4495b, § 1.02(1).

One of the Legislature's means of implementing this policy was to establish a reporting system and confidentiality requirements, as well as privileges from discovery in civil damage suits. The specific confidentiality provisions at issue state:

> (g) Except as otherwise provided by this Act, all proceedings and records of a medical peer review committee are confidential, and all communications made to a medical peer review committee are privileged.
>
> . . . .
>
> (j) Unless disclosure is required or authorized by law, records or determinations of or communications to a medical peer review committee are not subject to subpoena or discovery and are not admissible as evidence in any civil judicial or administrative proceeding without waiver of the privilege of confidentiality executed in writing by the committee.

Art. 4495b, § 5.06(g), (j) (emphasis added).

Another instructive provision is subsection (s)(3) of section 5.06:

> (3) In no event may . . . reports and records received, maintained, or developed by the board, by a medical peer review committee, or by a member of such a committee, or by a health-care entity be available for discovery or court subpoena or introduced into evidence in a medical professional liability suit arising out of the provision of or failure to provide medical or health-care services, or in any other action for damages.

Art. 4495b, § 5.06(s)(3).

Thus, subject to certain exceptions, all communications to a "medical peer review committee" are privileged and are not subject to discovery by virtue of the explicit wording of the statute. The question in this case is whether a hospital committee that is considering a physician's initial application for staff privileges is a "medical peer review committee" within the scope of article 4495b.

The statute answers this question. One of the enumerated functions of a medical peer review committee is the "denial of membership or privileges in a health-care entity." Art. 4495b, § 5.06(i).[1] Upon denial of staff

---

1. Section 5.06(i) provides:

   Disclosure of confidential peer review committee information to the affected physician pertinent to the matter under review shall not constitute waiver of the confidentiality provisions in this Act. If a medical peer review commit-

privileges, the physician is entitled to a written copy of the recommendation of the medical peer review committee and a copy of the final decision, including a statement of the basis for decision. *Id.*

The statutory definitions in section 1.03 of article 4495b do not lend themselves to the restrictive reading of the scope of a medical peer review committee's activities under section 5.06 urged upon us by the real parties in interest. A "medical peer review committee" is a committee of a health-care entity operating pursuant to approved, written bylaws that is "authorized to evaluate ... the competence of physicians." Art. 4495b, § 1.03(a)(6).[2] Further, under the terms of article 4495b, "medical peer review" includes the "evaluation of the qualifications of health-care practitioners." *Id.* § 1.03(a)(9).[3]

The credentialing process involves collecting, reviewing, and evaluating information concerning the professional competence of physicians applying for staff privileges. One function of a hospital credentialing committee is to collect and review information "on the professional competence and ethical practice of all applicants for medical staff privileges" and to recommend "approval or denial of staff privileges to the executive committee of

the medical staff." Butler, *Records and Proceedings of Hospital Committees Privileged Against Discovery*, 28 S.TEX.L.REV. 97, 100 (1987) (citing JOINT COMMISSION ON ACCREDITATION OF HOSPITALS, ACCREDITATION MANUAL FOR HOSPITALS 73–75 (1985 ed.)). The initial credentialing process inherently requires peer review because a "physician's qualifications, competence, and ethics all are called into question when a medical staff committee is requested to review his application for staff privileges." *Creech, supra,* 179 n. 4 (quoting Hall, *Hospital Committee Proceedings and Reports: Their Legal Status,* 1 AM.J.L. & MED. 245, 254 (1975)).

A judicial interpretation that excluded the initial credentialing process as part of the activities protected under article 4495b would be at odds with the purposes of the statute and its express provisions.

### B

The context in which the Legislature enacted section 5.06 of article 4495b is also illuminating. In 1986, Congress passed the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101, et seq. The federal Act imposes obligations upon medical peer review

---

tee takes action that could result in censure, suspension, restriction, limitation, revocation, or *denial of membership or privileges in a health-care entity,* the affected physician shall be provided a written copy of the recommendation of the medical peer review committee and a copy of the final decision, including a statement of the basis for the decision.
Art. 4495b, § 5.06(i)(emphasis added).

2. Section 1.03(a)(6) provides:
    (6) "Medical peer review committee" or "professional review body" means a committee of a health-care entity, the governing board of a health-care entity, or the medical staff of a health-care entity, provided the committee or *medical staff operates pursuant to written by-laws that have been approved by the policy-making body or the governing board of the health-care entity and authorized to evaluate the quality of medical and health-care services or the competence of physicians, including those functions specified by Section 85.204, Health and Safety Code, and its subsequent amendments. Such a committee includes the employees and agents of the committee, including assistants, investigators, intervenors, attorneys, and any other persons or organizations that serve the committee in any capacity.
    Art. 4495b, § 1.03(a)(6).

3. Section 1.03(a)(9) provides:
    (9) "Medical peer review" or "professional review action" means the evaluation of medical and health-care services, including evaluation of the qualifications of professional health-care practitioners and of patient care rendered by those practitioners. The term includes evaluation of the merits of complaints relating to health-care practitioners and determinations or recommendations regarding those complaints. The term specifically includes evaluation of:
    (A) accuracy of diagnosis;
    (B) quality of the care rendered by a health-care practitioner;
    (C) reports made to a medical peer review committee concerning activities under the committee's review authority;
    (D) reports by a medical peer review committee to other committees or to the board as permitted or required by law; and
    (E) implementation of the duties of a medical peer review committee by its members, agents, or employees.
    Art. 4495b, § 1.03(a)(9).

committees to report adverse actions taken against a physician if those actions are based on the competence or professional conduct of the physician. *See* 42 U.S.C. § 11133(a)(1). The impetus behind these requirements is set out in the federal Act: Congress concluded there was a "national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance," and that there was an "overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(2),(5).

It is evident from the federal Act that peer review in the initial credentialing process is an important part of the overall statutory scheme to improve the quality of medical care. The federal Act establishes a nationwide reporting system that extends not only to the revocation, suspension or surrender of a physician's license, 42 U.S.C. § 11132, but also to a *denial of an application for clinical privileges. See* 42 U.S.C. §§ 11133(a),(b); 11151(1),(3),(9),(10)(A).

Under the federal Act, the Secretary of Health and Human Services or its designee is the ultimate repository of the information that the federal Act requires be reported. 42 U.S.C. § 11134(b). The board of medical examiners in each state is required to report to the Secretary instances in which a health-care entity has denied an individual physician clinical privileges, in *addition to* instances in which it has changed or modified such privileges, where that denial or change is based on competence or professional conduct. *See* 42 U.S.C. §§ 11133(a), (b); 11151(10). (The federal Act enumerates considerations that do not involve the competence or professional conduct of a physician, such as physician's fees or advertisements. *See* 42 U.S.C. § 11151(9)(A)–(E).) Each board of medical examiners in turn receives information from health-care entities across the state regarding the denial of staff privileges. 42 U.S.C. § 11133(a)(1).

The basic reporting requirement applicable to physicians and health-care entities is found in 42 U.S.C. § 11133.[4] The definitions of the terms used in the federal Act make it clear that initial credentialing is within the scope of this section. An action that "adversely affect[s]" a physician includes "revoking, *denying,* or failing to renew clinical privileges." 42 U.S.C. § 11151(1) (emphasis added). The term "professional review action" is an action or recommendation taken or made in the conduct of "professional review activity," 42 U.S.C. § 11151(9), which in turn is defined as:

> (10) . . . [A]n activity of a health care entity with respect to an individual physician—
>
> > (A) *to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,*
> >
> > (B) to determine the scope or conditions of such privileges or membership, or
> >
> > (C) to change or modify such privileges or membership.
>
> > (A) the name of the physician or practitioner involved,
> > (B) a description of the acts or omissions or other reasons for the action . . . and
> > (C) such other information respecting the circumstances of the action or surrender as the Secretary deems appropriate.
>
> **(b) Reporting by Board of Medical Examiners**
> Each Board of Medical Examiners shall report, in accordance with section 11134 of this title, the information reported to it under subsection (a) of this section and known instances of a health care entity's failure to report information under subsection (a)(1) of this section.
> 42 U.S.C. § 11133.

4. The obligation to report appears in section 11133, which provides in part:
> **§ 11133. Reporting of certain professional review actions taken by health care entities.**
> **(a) Reporting by health care entities**
> > (1) **On physicians**
> > Each health care entity which—
> > (A) takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days;
> > . . . shall report to the Board of Medical Examiners, in accordance with section 11134(a) of this title, the information described in paragraph (3).
> >
> > . . .
> > (3) **Information to be reported**
> > The information to be reported under this subsection is—

42 U.C.C. § 11151(10) (emphasis added). *See also* 42 U.S.C. § 11151(3), (4) (containing the definitions of "clinical privileges," and "health care entity.").

Initial credentialing unquestionably is within the ambit of the federal Act expressly adopted by section 5.06 of article 4495b. *See* art. 4495b, § 5.06(a). We do not rely on the federal Act to broaden the scope of the explicit privileges in section 5.06 of article 4495b. *See Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.,* 701 S.W.2d 644, 647 (Tex.1985) (privileges are to be narrowly construed). However, we note that the Texas statute complements the federal Act. The Texas statute requires medical peer review committees or health-care entities to report to the Texas State Board of Medical Examiners, art. 4495b, § 5.06(b), as they are also required to do under the federal Act. 42 U.S.C. § 11133(a). It is implausible that the scope of the Texas statute does not extend to initial credentialing while the federal statute does.

### C

■ We reject the argument that documents relating to the initial credentialing process are "records made or maintained in the regular course of business" within the meaning of section 161.032(c) of the Health and Safety Code. That statute was amended in 1993 to include a reference to section 5.06 of the Medical Practice Act. Acts 1993, 73rd Leg., R.S., ch. 625, § 6, 1993 Tex.Gen.Laws 2347, 2350. If we were to conclude that records relating to initial credentialing within the meaning of section 5.06 were business records, we would in effect be destroying *all* privileges afforded under section 5.06. There is no basis under the express wording of section 5.06 to treat "denial of membership or privileges" any differently from "suspension, restriction, limitation, [or] revocation" of a physician's license. *See* art. 4495b, § 5.06(i). If documents generated under one type of proceeding or action are business records, documents relating to all of the other types of proceedings or actions are likewise business records. The Legislature did not intend to repeal the confidentiality and privilege provisions of section 5.06 by the

amendment to section 161.032 of the Health and Safety Code. *See* part IV.

### D

In ruling that the documents at issue were not protected from discovery under section 5.06, the trial court followed the holdings of one court of appeals in two cases issued on the same day, *McAllen Methodist Hospital v. Ramirez,* 855 S.W.2d 195 (Tex.App.—Corpus Christi 1993, orig. proceeding), and *Family Medical Center, U.T. v. Ramirez,* 855 S.W.2d 200 (Tex.App.—Corpus Christi 1993, orig. proceeding). In those cases, the court of appeals took a narrow view of the role of a medical peer review committee and, accordingly, of the extent of the privilege afforded under section 5.06. In *McAllen,* the court reasoned that for an evaluation by a peer review committee to be protected under section 5.06, it "must relate to activities or occurrences *at the hospital* so that corrective or preventative measures may be taken." 855 S.W.2d at 199 (emphasis added). The *McAllen* court of appeals cited our decision in *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988), for the proposition that initial credentialing is not a critical review or evaluation of events that had occurred "at the hospital." 855 S.W.2d at 199. The decision in *Family Medical Center* cites and follows the *McAllen* decision. *Family Medical Center,* 855 S.W.2d at 203.

The conclusion that the privileges under section 5.06 attach only to peer review evaluation of events that have already occurred "at the hospital" finds no support in the language of the statute. *See Northeast Community Hosp. v. Gregg,* 815 S.W.2d 320, 326 (Tex.App.—Fort Worth 1991, orig. proceeding) (in a dispute over discoverability of documents relating to initial credentialing, the court refused to "engraft" onto section 5.06 the requirement that documents be generated for purposes of reviewing a specific incident). To the contrary, as already discussed, the statute provides that initial credentialing is within the scope of activity of a medical peer review committee, along with suspension, restriction, limitation, or revocation of privileges. *See* art. 4495b, § 5.06(i) (denial of membership or privileges in a health-care

entity entitles affected physician to written copy of the medical peer review committee's recommendation). We disapprove of the decisions in *McAllen* and *Family Medical Center*, and a subsequent decision of the Corpus Christi court of appeals, *Riverside Hosp., Inc. v. Garza*, 894 S.W.2d 850, 856 (Tex. App.—Corpus Christi 1995, orig. proceeding), to the extent they hold that no information relating to initial credentialing by a peer review committee is privileged under section 5.06.

### E

Finally, we note that the highest courts of other states have held that initial credentialing documents fall within the scope of protected information under statutes similar to article 4495b. *See e.g., Alexander v. Superior Court (Saheb)*, 5 Cal.4th 1218, 23 Cal. Rptr.2d 397, 402–03, 859 P.2d 96, 101–02 (1993) (en banc) ("applications for staff privileges do indeed 'pertain to [a hospital medical staff] committee's investigative and evaluative functions' " and are thus protected from discovery by statutory exemption for records of a hospital medical staff committee); *McGee v. Bruce Hosp. Sys.*, 312 S.C. 58, 439 S.E.2d 257, 260 (1993) (statute that provides that "all data and information acquired by the committee" of a licensed hospital is confidential protects physicians' applications for staff privileges and supporting documentation submitted to committee from discovery); *Cruger v. Love*, 599 So.2d 111, 114 (Fla.1992) ("The policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee or board during the peer review or credentialing process are protected.").

The cases from other jurisdictions cited by the real parties in interest as supporting their position simply do not hold that initial credentialing documents are discoverable.

*See Shelton v. Morehead Memorial Hosp.*, 318 N.C. 76, 347 S.E.2d 824, 828–29 (1986) (statute protects discovery of medical review committee documents concerning doctor's performance at hospital unless otherwise available from another source; initial credentialing documents not at issue); *Anderson v. Breda*, 103 Wash.2d 901, 700 P.2d 737, 741–42 (1985) (en banc) (actual decision of medical review committee to restrict, revoke, or suspend a doctor's privileges is discoverable).

Under the explicit terms of article 4495b, a medical peer review committee that is gathering information on the quality of medical and health-care services or the competence of a physician who applies for staff privileges is a "medical peer review committee" within the meaning of article 4495b, provided that the committee meets the other requirements set out in the statute regarding its formation. Art. 4495b, § 1.03(6); *see also* § 5.06.

We next consider the applicability of section 161.032 of the Texas Health and Safety Code.

### IV

■ The Hospitals rely on section 161.032 of the Texas Health and Safety Code in addition to section 5.06 of article 4495b in asserting that the documents generated in connection with Dr. Leipzig's requests for staff privileges are confidential and not subject to discovery. The statute is straightforward, simple, and direct: "The records and proceedings of a medical committee are confidential and are not subject to court subpoena." TEX.HEALTH & SAFETY CODE § 161.032(a). The term "medical committee" is broadly defined.[5]

The real parties in interest contend that our decision in *Barnes v. Whittington*, 751 S.W.2d 493 (Tex.1988), forecloses any reli-

---

5. The definition of "medical committee" is found in section 161.031, which provides:

    (a) In this subchapter, "medical committee" includes any committee, including a joint committee, of:
      (1) a hospital;
      (2) a medical organization;
      (3) a university medical school or health science center;

    (4) a health maintenance organization licensed under the Texas Health Maintenance Organization Act ...; or
      (5) an extended care facility.
    (b) The term includes a committee appointed ad hoc to conduct a specific investigation or established under state or federal law or rule or under the bylaws or rules of the organization or institution.
TEX. HEALTH & SAFETY CODE § 161.031.

ance on section 161.032. We disagree. We do not read *Barnes* so expansively. Moreover, there has been a significant statutory change since our decision in *Barnes*.

### A

The controversy centers around the "regular course of business" provision in section 161.032. Section 161.032, like its predecessor, section three of former Texas Revised Civil Statute article 4447d, originally provided that the section "does not apply to records made or maintained in the regular course of business by a hospital, health maintenance organization, or extended care facility." Acts 1989, 71st Leg., R.S., ch. 678, § 1, 1989 Tex. Gen.Laws 2230, 2390. As of September 1, 1993, the Legislature amended section 161.032 to add that section 5.06 of article 4495b also does not apply to records made or maintained in the ordinary course of business. Acts 1993, 73rd Leg., R.S., ch. 625, § 6, 1993 Tex.Gen.Laws 2347, 2350. We are urged to hold, based on our decision in *Barnes*, that documents relating to the initial credentialing process are records made or maintained in the regular course of business and thus are not confidential.

In *Barnes*, the Court construed the scope of the statutory privilege afforded under section three of former Texas Revised Civil Statute 4447d.[6] 751 S.W.2d at 496. Our decision in *Barnes* was arguably subject to more than one interpretation. *Barnes* does state that requests for information about two doctors during the initial credentialing process were "routine administrative records, prepared by the hospital in the ordinary

course of business." 751 S.W.2d at 496. It could be argued from this language that initial credentialing records are business records and therefore beyond the scope of the privilege in section 161.032. However, the Court explained that the statutory privilege attaches to an investigation, review, "*or other deliberative proceeding*" of a medical committee. 751 S.W.2d at 496 (emphasis added). We concluded in *Barnes* that there was no evidence that the documents at issue were requested or submitted in connection with a "*deliberative process.*" *Id.* (emphasis added). This is not tantamount to holding, as the real parties in interest contend, that documents relating to the initial credentialing process are inevitably business records and therefore could never come within the scope of former article 4447d, section 3.

The debate over the reach of *Barnes* is quelled in any event by directives from the Legislature. The legislative intent in article 4495b is clear that initial credentialing of physicians is viewed as part of the critical peer review process. It is not a "routine administrative" matter and should be a "deliberative proceeding," within the meaning of *Barnes*, under either section 161.032 of the Texas Health and Safety Code or section 5.06 of article 4495b.

None of the cases this Court decided prior to *Barnes* excludes initial credentialing from the scope of former article 4447d. In *Texarkana Memorial Hospital, Inc. v. Jones*, 551 S.W.2d 33 (Tex.1977), the plaintiffs sued two hospital staff doctors and the hospital in which their infant son was treated. 551 S.W.2d at 34. They sought the minutes of

---

**6.** Section three of former article 4447d provides:

The records and proceedings of any hospital committee, medical organization committee or extended care facility committee established under state or federal law or regulations or under the by-laws, rules or regulations of such organization or institution shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records and shall not be available for court subpoena; provided, however, that nothing herein shall apply to records made or maintained in the regular course of business by a hospital or extended care facility. No physician, hospital, organization, or institution furnishing information, data, reports, or records

to any such committee with respect to any patient examined or treated by such physician or confined in such hospital or institution shall, by reason of furnishing such information, be liable in damages to any person. No member of such a committee shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him.

Acts 1969, 61st Leg., R.S., ch. 568, § 1, 1969 Tex.Gen.Laws 1719, *repealed by* Acts 1989, 71st Leg., R.S., ch. 678, § 13, 1989 Tex.Gen.Laws 2230, 3165 (codified without substantive change as Tex. Health & Safety Code §§ 161.031–.033).

various meetings of different hospital committees, including the minutes of all Pediatric and General Staff meetings over a four-year period. *Id.* It is unclear from the Court's opinion whether any of the committee meetings at issue concerned the credentialing of the doctors sued by the plaintiff. *See id.* In concluding that the minutes of *all* the meetings were protected from discovery, we held:

> The purposes of medical research and education, and the improvement of medical treatment, in any particular hospital or medical care facility is served by the free and uninhibited discussion of all events and experiences within the hospital or facility. The Legislature by this amendment [the 1969 amendment to section 3] must have intended to protect and encourage open and thorough review and investigation by making the records and proceedings of *any* such committee confidential and by expressly providing that they "shall not be available for court subpoena."

*Id.* at 35.

We further held that the minutes were not records made or kept in the regular course of business of the hospital even though they were kept in the same manner as other hospital records. *Id.* Construing the "regular course of business" exception in such a manner would be "self-defeating." *Id.* The Legislature could not have meant to forbid the discovery of committee proceedings and then immediately allow their discovery because they were ordinary business records. *Id.* Rather, we held that the statutory language "records made or maintained in the regular course of business" meant "records kept in connection with the treatment of [a hospital's] individual patients as well as the business and administrative files and papers apart from committee deliberations." *Id.* Finally, we noted that the privilege did not prevent discovery of material that had been presented to a hospital committee if it were otherwise available and "offered or proved by means apart from the record of the committee." *Id.* at 36.

In *Jordan v. Court of Appeals for Fourth Supreme Judicial District*, 701 S.W.2d 644 (Tex.1985), we again construed former article 4447d, section 3, and held that the language

"records and proceedings" included "those documents generated by the committee in order to conduct open and thorough review" and extended "to documents that have been prepared by or at the direction of the committee for committee purposes." *Id.* at 647–48. Protection did not extend to documents "gratuitously submitted to a committee" or "created without committee impetus and purpose." *Id.* at 648. We concluded in *Jordan* that although some of the documents at issue were privileged, the hospital had failed to carry its burden of demonstrating that the privilege was not waived when the documents at issue were presented to a grand jury. *Id.* at 649. *But see* art. 4495b, § 5.06(d) (containing a post-*Jordan* requirement that medical peer review committees and any physician in this state report relevant information to the State Board of Medical Examiners if the acts of a physician pose a continuing threat to the public welfare); § 5.06(j) (containing a post-*Jordan* provision that "provid[ing] access to otherwise privileged communications or records in cooperation with law enforcement authorities in criminal investigations is not [a waiver of] any privilege established under this Act.").

In sum, it cannot be said that any of our decisions holds that documents submitted to or created by an initial credentialing committee are business records, per se.

### B

Even were we to agree with the real parties in interest that *Barnes* held that initial credentialing records are business records under all circumstances, which we do not, the 1993 amendment to section 161.032 of the Texas Health and Safety Code would dispense with the continued validity of such a holding. Effective September 1, 1993, section 161.032(c) provides:

> (c) This section and Section 5.06, Medical Practices Act (Article 4495b ... ), do not apply to records made or maintained in the regular course of business by a hospital, health maintenance organization, medical organization, university medical center

or health science center, or extended care facility.

TEX. HEALTH & SAFETY CODE § 161.032(c).

As considered at some length in part III, section 5.06 of article 4495b expressly encompasses the initial credentialing process. Further, section 5.06 is tied to federal statutes that include the initial credentialing process within their reach. *See, e.g.,* 42 U.S.C. § 11133. It is inconceivable that the Legislature would totally nullify a significant part of section 5.06 by declaring in another statute that records relating to the initial credentialing process are business records.

However, we do think it significant that section 161.032(c) was amended to include a reference to section 5.06. As discussed, records maintained by a peer review committee in connection with the credentialing process are expressly privileged under section 5.06 and are not routine business records. The reference to section 5.06 in section 161.032 is a clear signal that records should be accorded the same treatment under *both* statutes in determining if they are made "in the regular course of business."

## V

■ CBS asserts that it has a constitutional right to gather and broadcast news about matters of public concern, such as the quality of medical care Leipzig provides to his patients. Because truth is a defense to an action for damages resulting from such a broadcast, CBS argues, it is entitled to the documents that the Hospitals claim are privileged in order to defend itself against Leipzig's defamation claim. Moreover, CBS asserts that the statute's explicit provision that allows only individuals participating in the peer review process to use otherwise privileged information in their defense in an action arising out of participation in peer review violates its rights of due process and equal protection because it is not afforded

the same opportunity. *See* art. 4495b, § 5.06(*o*).[7]

CBS fails to cite a single case or other authority in support of the argument that its constitutional rights would be violated. On the limited record before us, we find no constitutional impediment to applying the statute. CBS did not participate in any peer review process and stands on different footing than someone who did. Allowing CBS to pierce the veil of confidentiality afforded by the statute would not further the statute's purpose.

## VI

■ The documents that the Hospitals claim are privileged can be grouped into three primary categories: (1) minutes and recommendations from the meetings of various medical committees considering Dr. Leipzig's application, (2) inquiries about Dr. Leipzig from the Hospitals to a wide variety of sources and the corresponding responses, and (3) communications between the Hospitals and Leipzig, including Leipzig's initial staff applications and subsequent correspondence between Leipzig or his attorney and the Hospitals.

All of the Hospitals tendered the affidavits of their respective medical staff coordinators, who swore that they had personal knowledge of the affidavits' contents. The affidavits outline the structures of the Hospitals and their various committees, including the bylaws under which the committees have been formed. Copies of those bylaws are attached as exhibits. The affidavits state that the committees (1) operate pursuant to written bylaws approved by the governing boards of the Hospitals and (2) are authorized to perform evaluations of medical and health-care services, including the evaluation of the qualifications of professional health-care practitioners. The purpose of the committees, the affidavits aver, is to improve the quality of patient care. The affidavits further provide

---

7. The relevant portion of section 5.06(*o*) provides:

   A medical peer review committee, a person participating in peer review, or a health-care entity named as a defendant in any civil action filed as a result of participation in peer review, may use otherwise confidential information obtained for legitimate internal business and professional purposes, including use in its or his own defense. Such a use does not constitute a waiver of the confidential and privileged nature of medical peer review committee proceedings.
   Art. 4495b, § 5.06(*o*).

**12**

that one of the evaluation processes that the committees are authorized to perform involves the determination to grant or deny staff privileges.

Each affidavit specifically details the hospital's initial credentialing process established under the authority of the hospital bylaws. The affidavits include lists of the documents required in a physician's initial application and the process through which the committee authorizes and obtains further documentation and verifies references, licenses, or other qualifications. The affidavits then detail the evaluation and recommendation processes of the committees leading to an ultimate determination on the application.

The affidavits summarize and categorize the documents that the Hospitals produced in response to CBS's subpoenas. The affidavits state that, pursuant to the procedures previously outlined, the documents were prepared or requested by the committees of the Hospitals authorized to evaluate the qualifications of health-care practitioners. The affidavits further provide that the documents were used by the committees to investigate the qualifications and competence of the applicant.

Finally, the affidavits provide that the documents are confidential and that only the various committees and their authorized representatives have access to them. They state that the committees' files are kept apart from the Hospitals' patient and financial records.

■ We conclude that the detailed affidavits, together with the documents tendered in camera, satisfy the Hospitals' burden of proving that the three categories of documents outlined above are privileged under section 5.06 of article 4495b from discovery by CBS. It is well settled that an erroneous order requiring the production of privileged documents leaves the party claiming privilege without an adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833, 843 (Tex. 1992).

We conditionally grant writs of mandamus and direct the trial court to vacate its order requiring production of the documents tendered in camera.