**Opinion issued August 13, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-11-00946-CV**

———————————

**IN RE KENNETH HIGBY, M.D., Relator**

**Original Proceeding on Petition for Writ of Mandamus**

**OPINION ON REHEARING**

Real party in interest, Bruce Halbridge, moved for rehearing of our December 20, 2012 opinion. We grant the motion for rehearing, withdraw our December 20, 2012 opinion, and issue this opinion in its stead. Our disposition remains the same.

Relator, Kenneth Higby, seeks to compel the trial court to vacate its order denying his motion for protection and motion for reconsideration of the court's previous order requiring Higby to answer deposition questions. Higby contends that the deposition testimony at issue falls within the Texas Occupations Code's medical peer review privilege.[1]

We conditionally grant the petition for writ of mandamus.

## Procedural Background

Higby, a maternal-fetal medicine specialist, and Halbridge, an obstetrician-gynecologist, are both fellows of the American College of Obstetrics and Gynecology ("ACOG"). In 2005, Higby and Halbridge were both retained to provide expert opinions in a medical-malpractice lawsuit concerning the delivery of an infant who later developed a neurological injury ("the *Lange* case"). One of the defendant obstetricians retained Higby, and the plaintiff retained Halbridge. Neither provided direct medical care to the mother or to the infant. During the pendency of the *Lange* case, Halbridge prepared three expert reports and testified in a deposition. Higby reviewed two of Halbridge's expert reports. Ultimately, the *Lange* case settled before trial.

---

[1] Hon. Brady G. Elliott, Judge of the 268th District Court of Fort Bend County, Respondent. The underlying cause of action is *Bruce L. Halbridge, M.D. v. Kenneth Higby, M.D.*, No. 08-DCV-166064 (268th Dist. Ct., Fort Bend Cnty., Tex.).

2

On January 22, 2008, after the *Lange* case settled, Higby filed a complaint with the ACOG Grievance Committee, alleging that Halbridge had made false and misleading statements in his written reports in the *Lange* case, that Halbridge had fabricated information in his reports, and that Halbridge had opined on matters outside of his area of expertise, all of which are violations of ACOG's Code of Professional Ethics. Halbridge then sued Higby for defamation based on his written statements submitted to the Grievance Committee.[2]

During his deposition in the underlying proceeding, Higby declined to answer, on the instruction of his counsel, nine questions relating to his complaint to the Grievance Committee on the basis that such information was confidential and protected under the medical peer review privilege.[3] Halbridge sought to compel Higby to answer the deposition questions, arguing that the medical peer review privilege was inapplicable because the Grievance Committee did not qualify as a medical peer review committee. The trial court agreed with Halbridge and, on

---

[2]   In response to Halbridge's lawsuit, the Grievance Committee abated the grievance proceeding against Halbridge.

[3]   For example, Higby's counsel instructed him not to answer questions such as "[D]id you only learn about the existence of it, the Dr. Halbridge deposition in *Lange*, through the ACOG grievance process?" and "[D]id you ever pass on to ACOG any of this testimony where Dr. Halbridge was deferring to other specialities when he was being questioned [in *Lange*] by the lawyers that hired you?"

3

May 29, 2009, signed an order compelling Higby to respond to the deposition questions within five days.

Higby then petitioned this Court for a writ of mandamus, seeking to compel the trial court to vacate its order requiring him to answer the deposition questions. On June 10, 2010, this Court denied Higby's petition, with the majority holding that "the mandamus record before us contains no proof of any of the predicate facts that would establish whether a privilege applies." *In re Higby*, 325 S.W.3d 740, 743 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding) ("*Higby I*"). The majority concluded that Higby's evidence submitted in the motion to compel proceeding "does not address any of the facts necessary to establish whether the ACOG grievance committee was a 'medical peer review committee.'" *Id.* Ultimately, the majority held that, because it was "[f]aced with a record devoid of the necessary proof to establish whether a privilege applies," it could not conclude that the trial court abused its discretion when it granted Halbridge's motion to compel. *Id.* at 744. Thus, the majority "express[ed] no opinion on whether the ACOG grievance committee served as a 'medical peer review committee' for the purposes of Occupations Code section 160.007(e)." *Id.*

Higby then petitioned the Texas Supreme Court for a writ of mandamus. The supreme court denied Higby's petition without addressing the merits of his complaint.

4

After the Texas Supreme Court denied his petition, Higby moved the trial court for protection and for reconsideration of its original order granting Halbridge's motion to compel. Higby attached an affidavit to this motion in which he described ACOG's organization and the procedures of the Grievance Committee. The exhibits to this affidavit included copies of the ACOG Bylaws, the ACOG Grievance Procedures, and ACOG's Code of Professional Ethics. As further support for his motion for reconsideration, Higby attached an amicus brief drafted by ACOG, filed with the Texas Supreme Court during the pendency of Higby's mandamus petition before that court. In the brief, ACOG supported Higby's contention that the Grievance Committee constitutes a "medical peer review committee" and, thus, that Higby's communications to that committee fall within the medical peer review privilege.

At the hearing on Higby's motion, the trial court stated, "There is nothing that you have presented to me that is any different than what was presented at the first hearing." The court refused to consider Higby's affidavit on the ground that he was not qualified to testify as to ACOG's procedures. It denied Higby's motion for protection and for reconsideration. This mandamus proceeding followed.

**Mandamus Standard of Review**

Mandamus relief is available only to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Odyssey Healthcare, Inc.*, 310

5

S.W.3d 419, 422 (Tex. 2010) (per curiam) (orig. proceeding). A trial court commits a clear abuse of discretion when its action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (per curiam) (orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the particular facts. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).

Mandamus relief is appropriate to protect confidential and privileged information from discovery. *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 256 (Tex. 2005) (orig. proceeding); *Mem'l Hosp.-The Woodlands v. McCown*, 927 S.W.2d 1, 12 (Tex. 1996). An appellate court cannot cure the error when a trial court erroneously orders disclosure of privileged information that materially affects the rights of the aggrieved party. *In re Osteopathic Med. Ctr. of Tex.*, 16 S.W.3d 881, 883 (Tex. App.—Fort Worth 2000, orig. proceeding). "To make a prima facie showing of the applicability of a privilege, a party must plead the particular privilege, produce evidence to support the privilege through affidavits or testimony, and produce the documents for an *in camera* inspection, if the trial court determines review is necessary." *In re ExxonMobil Corp.*, 97 S.W.3d 353, 357 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). The burden to establish the privilege is on the party seeking to shield information from discovery, and the

6

party has the obligation to prove, by competent evidence, that the privilege applies to the information sought. *Arlington Mem'l Hosp. Found., Inc. v. Barton*, 952 S.W.2d 927, 929 (Tex. App.—Fort Worth 1997, orig. proceeding).

In his petition, Higby asserts that the trial court erroneously failed to consider (1) his affidavit describing the organization and procedures of the Grievance Committee, and (2) the supporting evidence consisting of copies of ACOG's Bylaws, Grievance Procedures, and Code of Professional Ethics. Halbridge did not move to strike Higby's affidavit or the attached supporting evidence in the trial court, and he did not contend that Higby lacked personal knowledge to testify as to ACOG's organization and procedures. The trial court, in denying Higby's motion for protection and reconsideration, stated, "As far as the affidavit, [Higby] may be a member of ACOG, but he is not part of the management of ACOG. He has no ability to testify as to the merits of their procedures. It's the wrong person, in other words."

For an affidavit to have probative value, the affiant must swear that the facts presented in the affidavit reflect his personal knowledge. *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008) (per curiam) (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 224 (Tex. 2004)). An affidavit showing no basis for personal knowledge is legally insufficient. *Id.* (citing *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994)); *Valenzuela v. State & Cnty. Mut. Fire Ins. Co.*, 317

7

S.W.3d 550, 554 (Tex. App.—Houston [14th Dist.] 2010, no pet.). An affiant's position or job responsibilities can qualify him to have personal knowledge of facts and establish how he learned of the facts. *Stone v. Midland Multifamily Equity REIT*, 334 S.W.3d 371, 375 (Tex. App.—Dallas 2011, no pet.); *Valenzuela*, 317 S.W.3d at 553 (citing *SouthTex 66 Pipeline Co., Ltd. v. Spoor*, 238 S.W.3d 538, 543 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)).

In his affidavit, Higby stated that he received a copy of the ACOG Bylaws, Grievance Procedures, and Code of Professional Ethics in his capacity as an ACOG fellow. These documents, which govern the inner workings of ACOG, including how the Grievance Committee conducts its proceedings, are also available on ACOG's website and, thus, are available to all ACOG fellows and the public. As an ACOG fellow who is bound by these documents, Higby had personal knowledge of the contents of these documents and the required procedures that they describe, and, therefore, he is competent to testify as to, for example, the procedures of the Grievance Committee as officially promulgated by the ACOG. Higby's status as a fellow of ACOG, even though he is not a member of ACOG management or of the Grievance Committee, qualifies him to have personal knowledge as to how the ACOG guidelines mandate that the Grievance Committee conduct its investigations and proceedings. *See Stone*, 334 S.W.3d at 375 (holding that affiant's position can qualify affiant to have personal knowledge

8

of facts and establish how affiant learned of facts); *Valenzuela*, 317 S.W.3d at 553 (holding same).

**Texas's Medical Peer Review Privilege**

Higby contends that the ACOG Grievance Committee qualifies as a "medical peer review committee" under Texas law, and, therefore, his communications to that committee fall within the medical peer review committee privilege.

*A. Relevant Facts*

Higby and Halbridge are both members of ACOG, a voluntary professional organization for physicians specializing in women's healthcare. ACOG promulgated a "Code of Professional Ethics," which provides that "[o]bstetrician-gynecologists, as members of the medical profession, have ethical responsibilities not only to patients, but also to society, to other health professionals and to themselves." This Code states several "ethical foundations for professional activities in the field of obstetrics and gynecology" and rules of conduct. According to the Code,

> The obstetrician-gynecologist must deal honestly with patients and colleagues. This includes not misrepresenting himself or herself through any form of communication in an untruthful, misleading, or deceptive manner. . . . All physicians are obligated to respond to evidence of questionable conduct or unethical behavior by other physicians through appropriate procedures established by the relevant organization.

9

The Code also states that "[t]he professional competence and conduct of obstetrician-gynecologists are best examined by professional associations, hospital peer-review committees, and state medical and licensing boards. These groups deserve the full participation and cooperation of the obstetrician-gynecologist." Further, "The obstetrician-gynecologist should strive to address through the appropriate procedures the status of those physicians who demonstrate questionable competence, impairment, or unethical or illegal behavior. In addition, the obstetrician-gynecologist should cooperate with appropriate authorities to prevent the continuation of such behavior."

ACOG also has a Grievance Committee, which provides a forum for one member to initiate a complaint against another member. The Grievance Committee

> receives, reviews and evaluates complaints from a College Fellow regarding professional conduct by a College Fellow that may violate the College's Code of Professional Ethics. The committee also pursues and reviews final state medical board actions resulting from professional conduct inconsistent with the [ACOG] Bylaws, including but not limited to serious state medical board actions such as revocation of license and any state medical board disciplinary action based on sexual misconduct.
>
> Hearing panels, composed of current or former committee members, thoroughly assess such complaints and determine if a complaint should be sustained and, if necessary, recommend disciplinary action to the Executive Board. The committee makes recommendations to the Executive Board regarding the grievance process and the scope of the committee's activities. Members of the committee may also act as

10

a hearing panel for applicants whose membership as a Fellow has been denied by the College.

The Grievance Committee Complaint Form, which is used to initiate a complaint before the committee, includes a section pertaining to "Information About Allegations of Unethical Testimony" and asks whether the respondent-member testified at a deposition, testified at trial, or prepared a written report.

When a member files a complaint with the Grievance Committee, the following steps occur:

(1)     The general counsel canvasses the members of the Grievance Committee to ensure that no conflict of interest exists.

(2)     The Grievance Committee reviews the complaint and may (a) determine that the matter is not appropriate for consideration or (b) assign the complaint to a hearing panel.

(3)     If the complaint is referred to a hearing panel, the respondent member is notified of the complaint, the names of the potential hearing panel members, and the materials considered by the Grievance Committee.

(4)     The respondent may request an oral hearing and may submit additional materials for the panel's consideration.

(5)     If the respondent requests a hearing, the complainant and respondent both receive notice and an opportunity to make a thirty-minute presentation to the panel.

(6)     At the conclusion of the hearing, the panel determines a finding:  (a) that the complaint is not sustained and no further action be taken; (b) that the complaint is not sustained and that a letter of notice be sent to the respondent detailing reservations about his behavior; or (c) that the complaint is sustained and the respondent be issued a warning, censured, suspended, or expelled from ACOG.

11

## B. *Medical Peer Review Privilege*

Texas Health and Safety Code section 161.0315(a) provides that

The governing body of a hospital, medical organization, university medical school or health science center, health maintenance organization, extended care facility, hospital district, or hospital authority may form a medical peer review committee, as defined by Section 151.002, Occupations Code . . . to evaluate medical and health care services . . . .

TEX. HEALTH & SAFETY CODE ANN. § 161.0315(a) (Vernon 2011). The Texas Occupations Code defines "medical peer review" as "the evaluation of medical and health care services, including evaluation of the qualifications and professional conduct of professional health care practitioners and of patient care provided by those practitioners." TEX. OCC. CODE ANN. § 151.002(a)(7) (Vernon 2012).

"Medical peer review" includes the evaluation of the:

(A)  merits of a complaint relating to a health care practitioner and a determination or recommendation regarding the complaint;

(B)  accuracy of a diagnosis;

(C)  quality of the care provided by a health care practitioner;

(D)  report made to a medical peer review committee concerning activities under the committee's review authority;

(E)  report made by a medical peer review committee to another committee or to the board as permitted or required by law; and

(F)  implementation of the duties of a medical peer review committee by a member, agent, or employee of the committee.

*Id.*

"Medical peer review committee" is defined as:

[A] committee of a health care entity, the governing board of a health care entity, or the medical staff of a health care entity, that operates under written bylaws approved by the policy-making body or the governing board of the health care entity and is authorized to evaluate the quality of medical and health care services or the competence of physicians, including evaluation of the performance of those functions specified by Section 85.204, Health and Safety Code.

*Id.* § 151.002(a)(8); *Martinez v. Abbott Laboratories*, 146 S.W.3d 260, 265–66 (Tex. App.—Fort Worth 2004, pet. denied). The Occupations Code does not define "medical and health care services" or "competence of physicians."

The definition of "health care entity" in the Occupations Code includes "a professional society or association of physicians, or a committee of such a society or association, that follows a formal peer review process to further quality medical care or health care." TEX. OCC. CODE ANN. § 151.002(a)(5)(C). The Occupations Code further provides that "each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." *Id.* § 160.007(a) (Vernon 2012); *In re Osteopathic Med. Ctr.*, 16 S.W.3d at 883–84 ("The essence of the medical peer review privilege is that documents made by or for a medical committee or medical peer review committee are confidential and privileged from discovery unless they are made in the regular course of business or the privilege has been waived.").

The medical peer review privilege is "intended to extend far enough to foster candid internal discussions for the purpose of making improvements in the quality

13

of care, but not so far as to permit the concealment of 'routinely accumulated information.'" *In re Living Ctrs.*, 175 S.W.3d at 260 (quoting *Barnes v. Whittington*, 751 S.W.2d 493, 496 (Tex. 1988) (orig. proceeding)); *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12, 17 (Tex. 1996) (orig. proceeding) ("The overarching purpose of the statute is to foster a free, frank exchange among medical professionals about the professional competence of their peers."). "[The privilege's] vitally important purpose is to promote the improvement of health care and treatment of patients through review, analysis, and evaluation of the work and procedures of medical entities and personnel who staff them." *In re Tollison*, 92 S.W.3d 632, 635 (Tex. App.—El Paso 2002, orig. proceeding); *McCown*, 927 S.W.2d at 3 ("[Medical peer review statutes] are based on two premises: first, that exacting critical analysis of the competence and performance of physicians and other health-care providers by their peers will result in improved standards of medical care; and second, that an atmosphere of confidentiality is required for candid, uninhibited communication of such critical analysis within the medical profession."). The purpose of a medical peer review committee is to "evaluate medical services, the qualifications of practitioners, and the quality of patient care given by those practitioners." *Family Med. Ctr., U.T. v. Ramirez*, 855 S.W.2d 200, 203 (Tex. App.—Corpus Christi 1993), *overruled on other grounds*, *McCown*, 927 S.W.2d 1. The function that the committee actually performs determines whether

its activities and communications made to it receive privileged status. *Id.* Thus, when a committee of a health care entity functions as a committee to evaluate the competence of its physicians, the records of and communications to the committee are privileged. *Id.*

### C. Standard of Review for Assertion of Medical Peer Review Privilege

The Texas Supreme Court has reasoned that, "[w]hile the medical privileges are important in promoting free discussion in the evaluation of health care professionals and health services, the right to evidence is also important, and therefore privileges must be strictly construed." *In re Living Ctrs.*, 175 S.W.3d at 258. Occupations Code section 151.002(a)(8) narrowly defines "medical peer review committee" as a committee that is "authorized to evaluate the quality of medical and health care services or the competence of physicians . . . ." TEX. OCC. CODE ANN. § 151.002(a)(8); *see also id.* § 151.002(a)(5) (defining "health care entity"); *id.* § 151.002(a)(7) (defining "medical peer review").

The functions and activities of a particular committee determine whether it qualifies as a peer review committee entitled to the medical peer review privilege. *Ramirez*, 855 S.W.2d at 203. In determining whether the trial court correctly applied the law concerning the medical peer review privilege, we give the trial court's order little deference. *See In re Ching*, 32 S.W.3d 306, 310 (Tex. App.—Amarillo 2000, orig. proceeding).

15

### D. Application of Texas Law to Higby's Claim of Privilege

ACOG has requested that its members report "evidence of questionable conduct or unethical behavior" by other members to the Grievance Committee. To that end, the Grievance Committee "receives, reviews and evaluates complaints from a College Fellow regarding professional conduct by a College Fellow that may violate the College's Code of Professional Ethics." The ACOG Code of Professional Ethics requires the obstetrician-gynecologist to "deal honestly with patients and colleagues," which includes "not misrepresenting himself or herself through any form of communication in an untruthful, misleading, or deceptive manner." ACOG's Code also provides that fellows "must not knowingly offer testimony that is false," "must testify only on matters about which he or she has knowledge and experience," and "must thoroughly review the medical facts of the case and all available relevant information" before offering testimony. The Grievance Committee also reviews final state medical board actions relating to professional conduct inconsistent with ACOG's Bylaws, including license-revocation actions and actions related to sexual misconduct.

Although the grievance proceeding that Higby initiated against Halbridge does not concern the quality of Halbridge's provision of care to a patient, it does concern the quality of Halbridge's expert opinions, as provided in several written reports in the *Lange* case. Higby alleged that Halbridge made false and misleading

16

statements in his expert reports, that Halbridge fabricated information in his reports, and that Halbridge offered his opinion on matters outside of his realm of expertise. Higby thus alleged that Halbridge's conduct during the pendency of the *Lange* case violated ACOG's Code of Professional Ethics.

The Occupations Code defines "medical peer review" to include "the evaluation of medical and health care services, including evaluation of the qualifications *and professional conduct* of professional health care practitioners and of patient care provided by those practitioners." TEX. OCC. CODE ANN. § 151.002(a)(7) (emphasis added). Similarly, a "medical peer review committee" is defined as a committee that is authorized to "evaluate the quality of medical and health care services or the competence of physicians." *Id.* § 151.002(a)(8). The Occupations Code does not define "competence of physicians."

A witness "qualified as an expert by knowledge, skill, experience, training, or education" may present opinion testimony. TEX. R. EVID. 702. Courts allow expert testimony when "scientific, technical, or other specialized knowledge" is necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*; *cf. GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999) ("Where, as here, the issue involves only general knowledge and experience rather than expertise, it is within the province of the jury to decide . . . ."); *see also K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam) ("When

17

the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony."). For expert testimony to be admissible, the proponent of the testimony must establish that the expert is qualified and that his testimony is relevant and based upon a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Thus, when a witness testifies as an expert and renders a professional opinion intended to assist the trier of fact, his competence to render that opinion is necessarily implicated.

By alleging that in offering his expert opinion in the *Lange* case Halbridge made false and misleading statements, fabricated information, and opined on matters outside the realm of his expertise, Higby essentially challenges Halbridge's competence to render an expert opinion. The essence of Higby's allegation challenges Halbridge's competence as a physician. *See Austin v. Am. Ass'n of Neurological Surgeons*, 253 F.3d 967, 974 (7th Cir. 2001) (noting, in dicta, that "[a]lthough Dr. Austin did not treat the malpractice plaintiff for whom he testified, his testimony at her trial was a type of medical service and if the quality of his testimony reflected the quality of his medical judgment, he is probably a poor physician"); *see also Joseph v. Dist. of Columbia Bd. of Med.*, 587 A.2d 1085, 1089 (D.C. Ct. App. 1991) ("It is undisputed that, as an expert witness, Dr. Joseph brought scientific principles to bear upon his subject. Since the patient was dead,

18

Dr. Joseph could not *prevent* her disease, nor was he in a position to *treat* it. Accordingly, the key word in the statutory definition is *diagnose*, and the question before us is whether it was 'plainly erroneous' for the Board to conclude that Dr. Joseph [by giving expert testimony] engaged in diagnosis within the meaning of the Act.") (emphasis in original).

The ACOG Grievance Committee is authorized to hear complaints from an ACOG fellow concerning another fellow's professional conduct, including complaints regarding the fellow's conduct when acting as an expert witness. Actions taken when serving as an expert witness implicate not only the fellow's obligation to act professionally and ethically under the ACOG Code of Professional Ethics but also the fellow's competence as a physician. Thus, when the Grievance Committee reviews complaints concerning a fellow's actions relating to expert witness testimony—such as complaints that the fellow made false and misleading statements in an expert report, fabricated information, and opined on matters outside his area of expertise—it evaluates the professional conduct of the professional health care practitioner, which constitutes "medical peer review" pursuant to Occupations Code section 151.002(a)(7), and it also evaluates the competence of the physician, which qualifies the committee as a "medical peer review committee" pursuant to section 151.002(a)(8).  *See* TEX. OCC. CODE ANN. § 151.002(a)(7)–(8); *Ramirez*, 855 S.W.2d at 203 (holding that function committee

19

actually performs determines whether its activities and communications made to it are privileged). Because, under the facts of this case, the Grievance Committee constitutes a medical peer review committee, we hold that, pursuant to Occupations Code section 160.007(a), Higby's communications to the Grievance Committee are privileged.[4] *See* TEX. OCC. CODE ANN. § 160.007(a).

Halbridge cites an intermediate Florida appellate court case, *Fullerton v. Florida Medical Association, Inc.*, 938 So. 2d 587 (Fla. Dist. Ct. App. 2006), as support for the proposition that providing expert testimony does not fall within the definition of "practicing medicine" and, therefore, scrutinizing expert testimony does not fall within the definition of peer review. The *Fullerton* court concluded that Florida's peer-review statute did not "clearly and unambiguously express[] the legislative intent that such [expert] testimony should be scrutinized by peer review," and, therefore, the statute did not provide immunity to doctors who had raised complaints to the Florida Medical Association concerning Fullerton's expert testimony. *Id.* at 591. The court noted that Florida's peer-review statute was "expressly created for the purpose of evaluating and improving the quality of health care *rendered* by providers of health service." *Id.* at 592 (emphasis in original).

---

[4] Because we hold that Higby's communications to the Grievance Committee fall within the scope of Texas's medical peer review committee privilege, we need not address Higby's additional contention that his communications are protected under the federal Health Care Quality Improvement Act.

According to the *Fullerton* court, "A physician who renders a medical service is ordinarily considered to be providing medical care to his or her patient," a conclusion that "becomes even more evident" when considering another section of the Florida statutes that defines "practice of medicine" as the "diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition." *Id.* The court concluded that Florida's peer-review statute "fails to immunize the FMA from liability when that body acts to evaluate the testimony of a medical expert given in a medical-malpractice action." *Id.*

> The statute at issue in *Fullerton* provided:
>
> There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a duly appointed medical review committee, or any health care provider furnishing any information . . . for any act or proceeding undertaken or performed within the scope of the functions of any such committee if the committee member or health care provider acts without intentional fraud.

*Id.* at 590. The statute also provided that it was "created for the purpose of 'evaluat[ing] and improv[ing] the quality of health care rendered by providers of health service or . . . determin[ing] that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care . . . .'" *Id.* at 591.

21

The Texas medical peer review statute, however, defines "medical peer review committee" more broadly. *See* TEX. OCC. CODE ANN. § 151.002(a)(8). In addition to defining a "medical peer review committee" as a committee that is "authorized to evaluate the quality of medical and health care services," the statute also provides that a medical peer review committee is a committee that is "authorized to evaluate . . . the competence of physicians . . . ." *Id.* Thus, the issue of whether providing an expert opinion qualifies as "practicing medicine" is irrelevant to the analysis of whether the Grievance Committee is a medical peer review committee. Providing expert testimony and opinions clearly implicates the competence of the physician, and thus the Grievance Committee falls within the purview of the medical peer review committee statute.

We hold that the trial court erroneously determined that the ACOG Grievance Committee does not constitute a medical peer review committee and that, therefore, Higby's communications to it were not privileged.

We sustain Higby's sole issue.

**Laches**

In his response to Higby's mandamus petition, Halbridge argues that mandamus relief should be denied to Higby under the doctrine of laches.

Mandamus is an extraordinary remedy, and it is not issued as a matter of right, but at the discretion of the court. *Rivercenter Assocs. v. Rivera*, 858 S.W.2d

22

366, 367 (Tex. 1993). Although mandamus is not an equitable remedy, the issuance of a writ of mandamus is largely controlled by principles of equity. *Id.*; *In re Key Equip. Fin. Inc.*, 371 S.W.3d 296, 300 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding) (quoting *In re Northrop*, 305 S.W.3d 172, 175 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding)). One such equitable principle is that "equity aids the diligent and not those who slumber on their rights." *Rivercenter*, 858 S.W.2d at 367; *In re Key Equip. Fin.*, 371 S.W.3d at 300. Delaying the filing of a petition for mandamus relief may waive the right to mandamus unless the relator can justify the delay. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 676 (Tex. 2009); *In re Hinterlong*, 109 S.W.3d 611, 620 (Tex. App.—Fort Worth 2003, orig. proceeding) (holding that it is "well-settled" that mandamus relief may be denied when party inexplicably delays asserting his rights). Laches, a doctrine which bars equitable relief, has two essential elements: (1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay. *In re Key Equip. Fin.*, 371 S.W.3d at 300 (quoting *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)).

Here, the trial court initially compelled Higby to respond to Halbridge's deposition questions on May 29, 2009. Higby sought mandamus relief from this Court in *Higby I* on June 12, 2009. This proceeding remained pending until June

23

10, 2010, when this Court issued its opinion in *Higby I* denying Higby's mandamus petition on the ground that the evidentiary record did not establish that the medical peer review committee privilege applied. *See* 325 S.W.3d at 744. Higby then sought mandamus relief from the Texas Supreme Court, as he was entitled to do, on July 30, 2010. This mandamus proceeding remained pending before the Texas Supreme Court until June 24, 2011, when the supreme court denied the petition without opinion. Higby filed his motion for protection and reconsideration, coupled with a new affidavit and ACOG's amicus brief, with the trial court on August 30, 2011, a course of action he was arguably invited to pursue in *Higby I.* The trial court, not persuaded by Higby's supporting evidence, denied this motion on October 7, 2011. Higby then filed this mandamus proceeding twenty days later, on October 27, 2011.

Halbridge focuses on the harm he has suffered while this dispute has been pending, and, although we acknowledge that the parties have been waiting years for the ultimate resolution of this question, very little of that delay has been attributable to Higby's failure to seek relief that he is entitled to pursue, such as protection via mandamus relief from disclosing information that ought to remain confidential. It is clear that Higby has not "slumber[ed] on [his] right[]" to seek mandamus relief from the trial court's order, and, therefore, we conclude that Higby has not unreasonably delayed his pursuit of mandamus relief. *See In re Key*

24

*Equip. Fin.*, 371 S.W.3d at 300; *In re E. Tex. Salt Water Disposal Co.*, 72 S.W.3d 445, 448 (Tex. App.—Tyler 2002, orig. proceeding) ("[T]he issue is whether a party has unreasonably delayed pursuing a right, *i.e.* mandamus relief, which is available to it."). We therefore hold that the doctrine of laches does not bar Higby's mandamus petition.

## Conclusion

We conditionally grant Higby's petition for writ of mandamus. We order the trial court to vacate its October 7, 2011 order denying Higby's motion for protection and reconsideration. The writ will only issue if the trial court fails to do so.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Massengale.

Justice Sharp, concurring in the result only.