# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00480-CV

**Parkview Nursing and Rehabilitation Center, Appellant**

**v.**

**Texas Department of Aging and Disability Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GN-11-000557, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Parkview Nursing and Rehabilitation Center appeals a district court judgment denying it injunctive and declaratory relief to restrain the Texas Department of Aging and Disability Services (DADS) from disclosing to third parties certain information that Parkview considers to be confidential and privileged. In two issues, Parkview urges that the district court erred in denying the requested relief. We will affirm the district court's judgment.

## BACKGROUND

Parkview operates a nursing home located in Big Spring. The nature of Parkview's operations requires it both to be licensed by the State of Texas and "certified" as complying with federal standards governing eligibility to participate in the Medicaid program. Both the licensing and Medicaid certification requirements are administered within this state by DADS, the primary Texas state agency that regulates nursing homes. *See* Tex. Hum. Res. Code § 161.071 (general powers and duties of DADS); Tex. Health & Safety Code § 242.033 (authorizing DADS

to issue nursing-home licenses). Pursuant to legislative directive, DADS has promulgated a single set of rules, titled "Nursing Facility Requirements for Licensure and Medicaid Certification" and codified in chapter 19 of Texas Administrative Code Title 40, that are intended to incorporate both the state licensing and Medicaid eligibility standards. *See* 40 Tex. Admin. Code § 19.1 (2013) (DADS, Basis & Scope);**[1]** *see generally id.* §§ 19.1–.2615 ("Nursing Facility Requirements for Licensure and Medicaid Certification"); *see also* Tex. Health & Safety Code § 242.037 (directing DADS to promulgate and enforce rules regarding nursing home licensures).

Among the many and varied requirements imposed on nursing homes by chapter 19, "[t]he facility"**[2]** must maintain records concerning "incidents" or "accidents" befalling a resident. *See* 40 Tex. Admin. Code § 19.1923 (Incident or Accident Reporting). Although "accident" is not defined specifically in chapter 19, an "incident" within the chapter is "[a]n abnormal event, including accidents or injury to staff or residents, which is documented in facility reports." *Id*. § 19.101(50). Information about "all incidents or accidents" must be memorialized in "clinical records on each resident" that the facility must maintain "in accordance with accepted professional health information management standards and practices." *See id.* §§ 19.1910 (Clinical Records), .1911(13)(B)(iii) (Contents of the Clinical Record), .1912 (Additional Clinical Record Service Requirements). "Incidents" or "accidents" also implicate rule 19.1923, titled "Incident or Accident Reporting." *See id.* § 19.1923. In addition to requiring that "[t]he facility must detail in the medical

---

**[1]** All references to Title 40 of the Texas Administrative Code are to regulations promulgated by DADS.

**[2]** *See* 40 Tex. Admin. Code § 19.101(39) (Definitions) ("Unless otherwise indicated, a facility is an institution that provides organized and structured nursing care and service and is subject to licensure under Texas Health and Safety Code, Chapter 242.").

record every accident or incident," *see id.* § 19.1923(a), rule 19.1923 mandates additional record keeping and reporting concerning accidents and any "unusual" incidents:

> Accidents, whether or not resulting in injury, and any unusual incidents or abnormal events including allegations of mistreatment of residents by staff or personnel or visitors, must be described in a separate administrative record and reported by the facility in accordance with the licensure Act and this section.

*Id*. § 19.1923(b). This "[a]ccident or incident report[]" must contain, with respect to "incidents involving residents":

- "the name of the resident"

- "witnesses, if any"

- "date, time, and description of the incident"

- "circumstances under which it occurred"

- "action taken including documentation of notification of the responsible party and attending physician, if appropriate"

- "the resident's current (post-incident) health condition, including vital signs and date and time of entry."

*Id*. § 19.1923(c)(1). Furthermore, rule 19.1923 requires that "[t]he facility must investigate incidents/accidents and complaints for trends which may indicate resident abuse, . . . includ[ing] but not limited to: type of accident, type of injury, time of day, staff involved, [and] staffing level and relationship to past complaints." *Id*. § 19.1923(d). Finally, this same rule requires the facility to make these incident reports available for review upon request by various state and federal agencies, including DADS. *See id.* § 19.1923(e).

3

The present dispute concerns two types of documents that Parkview creates and maintains, at least in part, to satisfy the requirements of rule 19.1923. The first is a document or form titled "Resident Incident Report" that contains information corresponding to that required of the "[a]ccident or incident report[]" under rule 19.1923—the name of any resident to whom an incident has occurred; witnesses; the date, time, and a description of the incident; circumstances or conditions present when the incident occurred; the actions taken by Parkview personnel in response; and the resident's post-incident condition, including vital signs. *See id.* § 19.1923(c)(1). Further, the Resident Incident Report categorizes incidents under "types" that include "skin tear–superficial," "fall," and "other," and similarly classifies injuries under "types" that include "skin tear," "abrasion," and "none apparent." The second type of Parkview document or form at issue is titled "Incident Log," which compiles and summarizes data from Resident Incident Reports for discrete one-month periods, listing the affected resident's name; incident date, time, and location; the "type" of incident and injury; and the "disposition" or treatment administered. At the end of the Incident Log for each one-month period, Parkview lists totals for each type of incident, type of injury, and incident location. Parkview refers to its Incident Logs as its "tracking and trending" information, an apparent allusion to rule 19.1923's requirement that it "investigate incident/accidents . . . for trends . . . includ[ing] type of accident, type of injury, time of day, staff involved, staffing level, and relationship to past complaints." *See id.* § 19.1923(d).

In addition to requiring this type of record keeping by nursing homes, DADS regulations require each "facility" to maintain a quality assessment and assurance (QA&A) committee consisting of its director of nursing services, a designated physician, and at least three other members of the facility's staff. *Id.* § 19.1917(a) (Quality Assessment & Assurance). A

4

facility's QA&A committee is to meet at least quarterly "to identify issues with respect to which quality assessment and assurance activities are necessary," "develop[] and implement[] appropriate plans of action to correct identified quality deficiencies," and "adopt and ensure implementation of a policy to identify, assess, and develop strategies to control risk of injury to residents and nurses associated with the lifting, transferring, repositioning, or moving of a resident." *Id*. § 19.1917(b), (e). Rule 19.1917 further provides that "Texas or the Secretary of Health and Human Services may not require disclosure of the records of the [QA&A] Committee except insofar as such disclosure is related to the compliance of the committee" with the rule's requirements that it meet at least quarterly and develop "plans of action" to correct "quality deficiencies." *Id*. § 19.1917(c). Additionally, "[g]ood faith attempts by the [QA&A] committee to identify and correct quality deficiencies may not be used as a basis for sanctions." *Id*. § 19.1917(d). Overlying this regulatory protection for nursing home QA&A committees are statutory privileges afforded certain types of medical communications, including the medical-committee privilege and the medical peer-review committee privilege, both of which, stated generally, keep the records and proceedings of those committees confidential and any communications made to them privileged. *See* Tex. Health & Safety Code § 161.032 (medical-committee privilege ); Tex. Occ. Code § 160.007 (medical peer-review committee privilege); *In re Living Ctrs. of Tex.*, 175 S.W.3d 253, 259 (Tex. 2005) (discussing various medical-committee privileges and holding that nursing home QA&A committees enjoy medical-committee privileges).

As required, Parkview has formed such a QA&A committee, which it describes as its "central" committee of this sort and as a "type" of medical peer-review committee. *See In re Living Ctrs.*, 175 S.W.3d at 259 (noting similarities between QA&A committees and medical peer-

5

view committees). In addition to fulfilling its QA&A committee duties, *see* 40 Tex. Admin. Code § 19.1917, Parkview contends that it has structured the process by which its personnel gather and utilize the information contained in its Resident Incident Reports and Incident Logs in such a way as to make those documents, contemporaneously, products of its QA&A committee. Specifically, according to the affidavit of owner and operator Vicki Cole, Parkview's Resident Incident Reports and Incident Logs are "submitted to and evaluated by" the QA&A committee "for the purpose of improving resident care" through "self-evaluation and critical review." Cole's affidavit further explains that the information recorded, maintained, presented, reviewed, and generated in this context, is kept as confidential and privileged. Finally, Parkview emphasizes, whenever a federal or state agency, such as DADS, investigates Parkview and requests its Resident Incident Reports and Incident Logs—which it terms "QA[&A] information"—its QA&A committee, not Parkview generally, is the entity that provides the information to the requesting body. In fact, Parkview goes as far to urge that because its Resident Incident Reports and Incident Logs are, in these ways, "QA&A committee product," DADS is not allowed even to ask for this information.

The genesis of the underlying dispute was a "complaint" (i.e., an allegation other than one reported by the facility itself[3]) made to DADS concerning care of a Parkview resident. This triggered an investigation of Parkview by a DADS surveyor, Debra Adams, who ultimately spent all or part of eleven days at the facility. *See* Tex. Health & Safety Code § 242.126 (requiring DADS to investigate reports of abuse and neglect).[4] During such an investigation or inspection

---

[3] *See id.* § 19.101(19) (defining "complaint").

[4] During its 2011 session, the Legislature repealed Subchapter E of Chapter 242 of the Texas Health and Safety Code, which includes section 242.126. *See* Act of June 27, 2011, 82d Leg., 1st C.S., ch. 7, § 1.05(m), 2011 Tex. Gen. Laws 5390, 5407 ("Subchapter E, Chapter 242,

6

of a nursing home, DADS is to make a determination as to whether the facility has violated any applicable regulations. *See* 40 Tex. Admin. Code § 19.2004 (Determinations & Actions Pursuant to Inspections); *see also id.* § 19.101(53) (defining "inspection" as including "complaint investigation"). DADS is to list any violations (also termed "deficiencies") on forms designed for that purpose, discuss the deficiencies with the facility's management, and elicit and approve a "plan of correction" from the facility that is also memorialized in the form. *See id*. § 19.2004(b)–(f). The record reflects that DADS utilizes two forms for these purposes, one promulgated by the federal Center for Medicaid Services (CMS) and known as a "CMS-2567," titled "Statement of Deficiencies and Plan of Correction"; the other a state form used for licensing purposes and known as a "3724," and titled "Statement of Licensing Violations and Plan of Correction." A nursing home may challenge a finding of a deficiency through an administrative process. *See id.* § 19.2147 (Remedies in Medicaid-Certified Facilities) (providing for informal dispute-resolution process).

During her investigation, Adams interviewed several Parkview employees and requested, obtained, and reviewed not only Parkview patient clinical files but also its Resident Incident Reports and Incident Logs. When Adams concluded her inquiry, she did not find a deficiency in connection with the complaint that had originally prompted her investigation, but she nonetheless cited Parkview for a different alleged deficiency related to the training or skill of Parkview's nurse's aides in performing a certain aspect of patient care. Adams prepared a

---

Health and Safety Code, is repealed."); *see also id.* § 1.05(c), 2011 Tex. Gen. Laws at 5399 (adding chapter titled "Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities") (codified at Tex. Health & Safety Code §§ 260A.001–.018). But the Legislature included a savings clause continuing the prior law in effect as to any conduct occurring before the legislation's effective date. *See id.*, § 1.05(q), 2011 Tex. Gen. Laws at 5408. All the conduct relevant to this case occurred before the legislation's effective date.

form CMS-2567 summarizing her conclusions and Parkview's plan of correction. To support her assertions that a deficiency in skill or training was present, Adams referenced her own personal observations, her interviews with Parkview personnel, and the contents of patient medical records. She also summarized and, in one instance, directly quoted portions of various individual Resident Incident Reports that, in her view, illustrated examples of the deficiency she had alleged. Adams likewise discussed the manner in which Parkview tracked or categorized such events in its Incident Logs. *See* Tex. Health & Safety Code § 242.126 (requiring final written report).

Upon receipt of Adams's completed CMS-2567 form, Parkview sought injunctive and declaratory relief in the district court below to prevent DADS from publicly disclosing certain excerpts of the CMS-2567 that quote, summarize, or reference the contents of Resident Incident Reports or Incident Logs. *See* Tex. Gov't Code § 552.325 (listing proper parties to suit seeking to withhold information). Parkview urged that the information in question was confidential by law, such that disclosure was barred, by virtue of the regulatory QA&A protection and the statutory medical-committee privileges. Parkview further asserted that Adams and DADS had violated the prohibition against relying on "[g]ood faith attempts by the [QA&A] committee to identify and correct quality deficiencies . . . as a basis for sanctions." 40 Tex. Admin. Code § 19.1917(d).

Parkview succeeded in obtaining a temporary restraining order barring DADS from disclosing the excerpts in question, and its claims proceeded to final hearing.[5] To establish its privilege claims, Parkview presented Cole's affidavit and the live testimony of its administrator

---

[5] In the meantime, CMS intervened and removed the case to federal district court. On motion of Parkview, the federal district court, concluding that CMS lacked a justiciable interest in the proceeding, dismissed the agency's intervention and remanded the case back to the district court below.

and QA&A committee chair, Kristi Dian Beauchamp. It also tendered for in camera inspection a copy of Adams's completed CMS-2567 form, with the disputed excerpts highlighted, along with copies of its Resident Incident Reports and Incident Logs whose contents, Parkview claimed, had been improperly quoted or incorporated in the completed form. DADS presented the testimony of Carol Ahmed, its director of survey operations.

After hearing evidence, the district court ultimately signed a final judgment denying Parkview's claims for injunctive and declaratory relief in full. In its judgment, the court specifically concluded that DADS—

> may use the documents at issue for statutorily authorized purposes to include, but not limited to, 1) internal use of the incident reports [and] tracking and trending documents; 2) release of redacted, or de-identified, complete written investigation reports in response to an open records request; 3) release of redacted, or de-identified, Federal Form 2567 and State Form 3724 [i.e., the state licensing form] in response to an open records request; and 4) posting of general or broad descriptions of the deficiencies contained in Forms 2567 and 3724 on the DADS Long Term Care Quality Reporting System.

The district court did not make findings of fact and conclusions of law to elaborate on the bases for its judgment, nor were any requested.[6] This appeal ensued.

---

[6] Parkview emphasizes that the district court discussed rationales for its ruling, in both written correspondence to the parties and oral statements made during a hearing, before it signed its judgment. However, Parkview ultimately acknowledges that such statements, as contrasted with written findings of fact and conclusions of law made in support of the signed judgment, do not impact the scope of our appellate review. *See Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, 375 S.W.3d 464, 482 n.24 (Tex. App.—Austin 2012, pet. denied).

**ANALYSIS**

Parkview brings two issues on appeal. In its first, Parkview contends that the district court erred in permitting DADS and Adams to quote verbatim, in a document subject to public disclosure, the contents of its Resident Incident Reports and Incident Logs because those contents were confidential and privileged, and were not a proper basis for the cited deficiencies. Predicated on its argument and analysis in support of its first issue, Parkview urges in its second issue that the district court erred in refusing its claims for declaratory and injunctive relief.

The analytical linchpin of Parkview's contentions is its assertion that its above-described process whereby its QA&A committee utilizes the information contained in its Resident Incident Reports and Incident Logs makes those documents, contemporaneously, documents of its QA&A committee and, in turn, confidential and privileged under the statutory medical-committee privileges, *see* Tex. Health & Safety Code § 161.032 (medical-committee privilege); Tex. Occ. Code § 160.007 (medical peer-review privilege), and subject to rule 19.1917's tight restrictions on regulators' ability to access or use the information, *see* 40 Tex. Admin. Code § 19.1917(c), (d). As such, Parkview contends, DADS had no right to request or obtain those documents from Parkview in the first place, let alone incorporate or quote verbatim the contents of those records in its completed written investigation report, a document that would be open to the public. *See id.* § 19.2010(b) (making completed investigation reports open to public); *see also* Tex. Gov't Code § 552.022 ("completed report . . . by a governmental body" is public information). Parkview adds that allowing DADS to access those documents and incorporate them into its public investigation reports would "dismantle" the QA&A regulatory process, have a "chilling effect" on the medical community's efforts to improve patient care, and severely damage the collaborative relationship and

10

free flow of information between nursing homes and DADS that is envisioned by the Health Code. *See* Tex. Health & Safety Code § 242.001(a) (describing Chapter 242's purposes). DADS argues in response that Parkview's QA&A procedures do not affect DADS's statutory and regulatory authority to obtain and use Parkview's rule 19.1923 incident reports and tracking/trending documents—i.e., its Resident Incident Reports and Incident Logs—including using information from those documents in a de-identified final, written report.

The parties' competing contentions turn ultimately on construction of statutes and administrative rules, which present questions of law that we review de novo under traditional principles of statutory construction. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (holding that administrative rules are interpreted under principles of statutory construction); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 ("Statutory construction is a legal question we review de novo."). Our primary objective is to ascertain and give effect to the drafters' intent. *See TGS-NOPEC*, 340 S.W.3d at 439 (citing Tex. Gov't Code § 312.005; *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 176 (Tex. 2004)). We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided. *See id.* (citing Tex. Gov't Code § 311.011(b)). We consider the statutes or rules as a whole rather than their isolated provisions. *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)). We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully. *See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)). Undefined terms are typically given their ordinary meaning, but if a different or more precise definition is apparent from the terms' use in context, we apply that meaning. *Id.* (citing *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009)). If the text of the enactment

11

is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results that the drafters could not possibly have intended. *See id.* (citing *Mega Child Care*, 145 S.W.3d at 177). If the text is ambiguous, however, we are to defer to an authoritative administrative construction that is reasonable and consistent with the text of the provision. *See id.* at 438 ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, as there is here, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule.").

We are compelled to agree with DADS that its construction and application of the relevant statutes and rules is, if not the sole correct construction, at least reasonable and not inconsistent with the text of those provisions, such that we should defer to it. As DADS suggests, Parkview's creation and maintenance of its Resident Incident Reports and Incident Logs derives from statutory and regulatory requirements that are distinct in origin and purpose from those governing the proceedings and records of its QA&A committee. DADS regulations specifically require the "facility"—i.e., the nursing home, *see* 40 Tex. Admin. Code § 19.101(40) (defining "facility" as "the institution" that provides nursing care); *see also* Tex. Health & Safety Code § 242.002(6), (10) (defining "facility" and "institution")—to create and keep these documents, to investigate accidents, incidents, and complaints for trends, and to make the incident reports available for review upon request. *See* 40 Tex. Admin. Code §§ 19.1923(a), (d), (e), .2002(h); *see also* Tex. Health & Safety Code § 242.049(c) (specifying that DADS may require nursing homes to submit information necessary to improve quality of care in nursing homes). A different rule requires Parkview to maintain a QA&A committee, prescribes that committee's proceedings, and provides the privileges that attach to proceedings and records of that committee. *See* 40 Tex. Admin. Code

12

§ 19.1917. Unlike the rule governing the Resident Incident Reports and Incident Logs, the focus of the rule governing QA&A committees is not information-gathering in itself, but collaboration among a "group of healthcare professionals in a facility" to "develop and implement appropriate action to identify and rectify substandard care and deficient facility practice." *See id.* §§ 19.101(112) (defining QA&A committee), .1917(b) (describing committee's role and purpose); *see also In re Living Ctrs.*, 175 S.W.3d at 260 (noting that these types of medical committees "foster candid internal discussion for the purpose of making improvements in the quality of care"). Likewise, it is this evaluative process by the QA&A committee, and any resulting conclusions or plans, that would be the product of that committee, and thereby subject to the QA&A protections from disclosure, not the bare facts or information about incidents or accidents at the nursing home that might be provided to the committee for analysis. *See In re Living Ctrs.*, 175 S.W.3d at 260 (noting that privilege "protects products of the peer review process," but does not protect otherwise available information simply because it was reviewed by committee). Against the backdrop of this regulatory framework, DADS appropriately determined that Parkview's practice of providing underlying facts and information to its QA&A committee in the form of Resident Incident Reports and Incident Logs it compiles under rule 19.1923 does not ipso facto convert those reports and logs into privileged records of its QA&A committee.

Alternatively, even assuming Parkview's practices could have made its Resident Incident Reports and Incident Logs records "of" its QA&A committee in some relevant sense, rule 19.1923 would still support DADS's determination that the information was not privileged. Regardless of their characterization, the incident reports and tracking logs created pursuant to rule 19.1923 "must be released upon request" in connection with an inspection or survey because

13

they are documents "maintained by or on behalf a facility." *See* 40 Tex. Admin. Code § 19.2002(h); *see also* Tex. Health & Safety Code § 242.043 ("The department is entitled to access to books, records, and other documents maintained by or on behalf of an institution."). Nor, contrary to Parkview's arguments, would allowing DADS to access and use these documents in an investigation violate rule 19.1917's prohibition against punishing a nursing home for its QA&A committee's efforts to identify and correct quality deficiencies. *See* 40 Tex. Admin. Code § 19.1917(d) ("Good faith attempts by the committee to identify and correct quality deficiencies may not be used as a basis for sanctions."). The documentation of incidents and accidents at a facility in compliance with mandatory licensing terms cannot be fairly characterized as a "good faith attempt" to do anything other than comply with the licensing requirement. Similarly, the records at issue here do not document or identify "quality deficiencies," a term that suggests qualitative analysis or judgment, but instead "detail . . . every accident or incident" that occurs at the facility. *See id.* § 19.1923(a). And while the incident reports and logs may be analyzed to identify these deficiencies, it is the analysis and examination leading to the identification of a deficiency that is protected by the QA&A committee privilege and rule 19.1917, not the incidents themselves, that are privileged. Stated another way, the "good faith efforts to identify and correct quality deficiencies" are, for example, the subsequent analysis or evaluation of the incident reports and tracking logs, the resulting determination of causation, recommended actions, and a plan to eliminate the problem. Rule 19.1917 protects a nursing home from being sanctioned based on a good-faith attempt to identify or correct a deficiency, but it does not protect the nursing home from the consequences of the underlying deficiencies themselves. Parkview's Resident Incident Reports and Incident Logs were not the basis for the adverse DADS report here—the accidents and incidents themselves were.

14

Thus, to the extent that Parkview is suggesting that the documentation and tracking of incidents and accidents by a QA&A committee should insulate a nursing home from review of those events, that would circumvent Chapter 242's goal of making nursing homes accountable for resident care. *See* Tex. Health & Safety Code § 242.001(d)(4) (requiring nursing homes to "provid[e] the public with information concerning the operation of institutions in this state"). It would also directly contradict the DADS regulation making these documents available to the public. *See* 40 Tex. Admin. Code §§ 19.1923(e), .2202(h). Accordingly, DADS acted consistently with these enactments in requesting these documents and in including information from them in its written investigation report.

Similarly, Parkview's Resident Incident Reports and Incident Logs would not be protected as QA&A-committee product under the relevant statutory medical-committee privileges because they are made or maintained in the regular course of Parkview's nursing-home business. The medical-committee privileges specifically except from the privilege those records that are "made or maintained in the regular course of business." *See* Tex. Health & Safety Code § 161.032(f) (providing that the privilege does not apply "to records made or maintained in the regular course of business by a" nursing home); Tex. Occ. Code § 161.032(f) (same for medical peer-review committee); *In re Living Ctrs.*, 175 S.W.3d at 257 (discussing business-records exception to medical-committee privileges). Parkview, like other licensed nursing homes in Texas, must comply with state and federal nursing-home regulations to keep its license. *See* Tex. Health & Safety Code § 242.031. As discussed at length above, rule 19.1923 mandates that it create and maintain the incident reports and tracking logs at issue here and make them available to DADS upon request. *See* 40 Tex. Admin. Code § 19.1923(a). Certainly, documents that the nursing home itself must create, maintain, and present upon request to stay licensed are documents that are "made

15

or maintained in the regular course of [that] business." *See Memorial Hosp.-The Woodlands v. McCown*, 927 S.W.2d 1, 10 (Tex. 1996) (holding that this exception means "records kept in connection with the treatment of [a hospital's] individual patients as well as the business and administrative files and papers apart from committee deliberations"); *see also In re Living Ctrs.*, 175 S.W.3d at 257–58 (citing *McCown* for same proposition).

This construction also comports with the purposes of the medical-committee privileges—i.e., to "promote free discussion in evaluation of health care professionals and health services," *see In re Living Ctrs.*, 175 S.W.3d at 258–59—by protecting the evaluative processes of those committees, but not the underlying facts being evaluated, such as "records made or maintained in the regular course of business" by the facility or the documents that simply pass through the committee. *See id.* at 257. "The privilege extends only to information generated by the hospital committee *in its investigation or review process*." *Barnes v. Whittington*, 751 S.W.2d 493, 496 (Tex. 1988) (emphasis added); *see McCown*, 927 S.W.2d at 3 (noting that privileged documents are those "generated in connection with a review"); *see also In re Living Ctrs.*, 175 S.W.3d at 257 (quoting *McCown* for proposition that documents protected under medical-committee privileges "are those 'generated' by a committee or 'prepared by or at the direction of the committee for committee purposes'"). "Texas courts have consistently limited the peer-review committee privileges to those documents generated by the committee as a result of the committee's deliberative processes and to those submitted to the committee at their direction and in furtherance of the committee." *Capital Senior Mgmt. 1, Inc. v. Texas Dep't of Human Servs.*, 132 S.W.3d 71, 77 (Tex. App.—Austin 2004, pet. denied) (citing, among others, *McCown*, 927 S.W.2d at 9). Parkview's Resident Incident Reports and Incident Logs are not information generated in or from an investigation or review

16

process. They are documents mandatorily generated in response to and with the purpose of recording the factual details of an incident or accident at the nursing home to comply with a regulatory requirement of Parkview's nursing-home license. They contain no analysis, evaluation, or opinion, only facts about the incident. As such, while they might be the subject of an investigation or review process, they themselves are not the product of such an evaluative process.

Finally, we would note that DADS regulations and the Health & Safety Code contemplate the eventual release of the information contained in Parkview's Resident Incident Reports and Incident Logs in the manner that occurred here. While rule 19.2010 specifies that the reports, records, and working papers used by DADS in an investigation—e.g., including, here, Parkview's Resident Incident Reports and Incident Logs—are confidential, it also specifies that those same documents "may be released to the public" if done so in a completed written investigation report, "provided the report is de-identified." *See* 40 Tex. Admin. Code § 19.2010(a). Likewise, to comport with its goal of protecting residents by making sure that nursing homes "provide the public with information concerning the operation of" nursing homes, *see* Tex. Health & Safety Code § 242.001(d)(4), the Legislature has mandated that DADS "establish proper procedures to ensure that copies of all forms and reports [in connection with DADS investigations] are made available to consumers, service recipients, and the relatives of service recipients as the department considers proper." *Id.* § 242.043(f). Further, and more important, the Health and Safety Code requires DADS, upon receipt and investigation of a complaint of abuse, to produce a written investigation report that includes the investigator's personal observations, a review of relevant documents and records, a summary of each witness statement, and a statement of the factual basis for the findings, and to make that investigation report open to the public once de-identified. *See id.* § 242.126(e), (g).

17

In response, Parkview asserts that section 242.049, which it suggests is the authority for rule 19.1923's incident reports and tracking logs, requires DADS to keep those documents privileged and confidential:

> The collection, compilation, and analysis of the information and any reports produced from these sources shall be done in a manner that protects the privacy of any individual about whom information is given and is explicitly confidential. The department shall protect and maintain the confidentiality of the information. The information received by the department, any information compiled as a result of review of internal agency documents, and any reports, compilations, and analyses produced from these sources shall not be available for public inspection or disclosure, nor are these sources public records within the meaning of [the Texas Public Information Act]. The information and any compilations, reports, or analyses produced from the information shall not be subject to discovery, subpoena, or other means of legal compulsion for release to any person or entity except as provided in this section and shall not be admissible in any civil, administrative, or criminal proceeding. This privilege shall be recognized by Rules 501 and 502 of the Texas Rules of Evidence.

*Id.* § 242.049(d). Initially, we note that, given section 242.049's silence on the subject, section 242.037 is a more likely candidate for DADS's rulemaking authority:

> The department shall make and enforce rules and minimum standards to implement this chapter, including rules and minimum standards relating to quality of life, quality of care, and residents' rights.

*Id.* §§ 242.037(a), .049. Section 242.049, on the other hand, provides that, in the context of DADS's "evaluat[ion of] data for quality of care," nursing homes "may be required to submit information designated by the department as necessary to improve the quality of care in nursing homes." *See id.* § 242.049(a), (c). Regardless, however, even though section 242.049 requires DADS to keep the quality-of-care information and reports confidential, it also acknowledges that public information, such as the investigation report at issue in this case, might be a source of quality-of-care information

18

considered by DADS and, as discussed above, it specifically emphasizes that such public information retains its status as public information:

> Any information, reports, and other documents produced which are subject to any means of legal compulsion or which are considered to be public information under Subchapter E [regarding reports and investigation of abuse] and the rules adopted under that subchapter shall continue to be subject to legal compulsion and be treated as public information under Subchapter E after the effective date of this Act, even though such information, reports, and other documents may be used in the collection, compilation, and analysis described in Subsections (b) and (d).

*Id.* § 242.049(i); *see also id.* §§ 242.121–.135 (Subchapter E, "Reports of Abuse and Neglect").[7] The investigation of Parkview underlying this appeal was initiated in connection with a complaint regarding a Parkview resident, and resulted in the written investigation report that is at issue here. *See id.* § 242.126(a), (e) (requiring investigation of complaint alleging abuse and written investigation report). As such, DADS's de-identified written investigation report of Parkview is public information. *Id.* § 242.126(g) (DADS must make de-identified report available to public).

Parkview also suggests that the Texas Supreme Court's decision in *In re Living Centers*, 175 S.W.3d 253, and two decisions from this Court, *see Capital Senior*, 132 S.W.3d at 76; *Ebony Lake Nursing Center v. Texas Dep't of Human Servs.*, 62 S.W.3d 867, 873–74 (Tex. App.—Austin 2001, no pet.), support its contention that the very documents at issue in this case—i.e., regulatorily required incident reports and tracking logs—are privileged under the medical-committee privileges. We disagree. Although the documents in *In re Living Centers* were described as incident reports and logs, the supreme court held only that those particular documents "*may* be

---

[7] As discussed in footnote 4, Subchapter E was repealed by the Legislature in 2011. *See* 2011 Tex. Gen. Laws 5390 at 5407.

privileged," but that further review by the trial court was necessary because the documents had been improperly deemed not privileged based solely on the fact that they had not been physically marked as QA&A documents. *See id.* at 261 (emphasis added). In other words, the supreme court did not hold that the incident reports and tracking logs required by DADS regulations are QA&A documents entitled to the QA&A privilege. The supreme court instead directed the trial court to vacate its prior order to produce all the documents that were not physically marked as confidential, and to determine on further examination whether those documents may be privileged. *Id.* at 262. Finally, *In re Living Centers* addressed whether the reports and logs themselves were privileged in connection with a discovery request in a wrongful death action, not whether a completed, written investigation report by DADS could include de-identified portions of those documents. *Id.*

Likewise, in *Capital Senior*, which involved an open records request to DADS, we did not hold that a nursing home's incident reports are privileged under the medical-committee privileges. Instead, we held that the requested documents—which were reports of abuse rather than the required incident reports at issue in this case—were confidential under rule 19.2010(a) "because they had been used by DADS during its surveys and investigations." 132 S.W.3d at 75–76. We also specifically noted that the provision in rule 19.2010(a)(1) for de-identified information in completed written investigation reports did not apply in *Capital Senior* because there was no completed written report in that case. *Id.* at 76. Likewise in *Ebony*, which involved an open-records request for a nursing home's incident reports, we held that the nursing home had established that it was entitled to a temporary injunction and remanded the matter to the trial court for a trial on the merits. Importantly, however, in discussing the fact that the reports were required by law, we noted the documents at issue in *Ebony* included more than just information about the particular

20

incidents that had occurred in the nursing home; they also included information regarding subsequent investigations by the QA&A committee of the actions of some of the facility's medical staff and actions taken by the facility towards its employees as a result of the incidents. *See* 62 S.W.3d at 873. In other words, the nursing home in *Ebony* presented evidence that their documents contained information regarding the QA&A committee's evaluative process. The documents in this case do not contain any evaluative information.

We overrule Parkview's first issue on appeal. And because Parkview's second issue on appeal is predicated on a favorable disposition of its first issue, we overrule it as well.

**CONCLUSION**

Having overruled Parkview's issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   January 10, 2014